311 So.2d 568 (1975)
Interdiction of Charlie FUQUA, Plaintiff-Appellant,
v.
Luther FUQUA, Defendant-Appellee.
No. 4982.
Court of Appeal of Louisiana, Third Circuit.
April 21, 1975.
*569 Edward A. Kaplan, Kaplan & Rivers, Alexandria, for petitioner-appellant.
Riddle & Bennett by Darrel D. Ryland, Marksville, for defendant-appellee.
Before HOOD, MILLER and WATSON, JJ.
WATSON, Judge.
Luther Fuqua, the son of Charlie Fuqua, filed a petition in Avoyelles Parish, Louisiana, alleging that his father, Charlie Fuqua, was domiciled in Avoyelles Parish; that his father was mentally incompetent; that Charlie Fuqua should be interdicted, and that Luther Fuqua wished to be appointed curator. Charlie Fuqua was served at the Hilltop Nuring Home in Pineville, Rapides Parish, Louisiana, and an attorney was appointed to represent him.
The matter was heard in chambers and a judgment of interdiction rendered on April 5, 1974. Luther Fuqua was appointed curator of the interdict and Mrs. Lela Fuqua McGraw Stewart was appointed under-curatrix of the interdict.
Following the judgment of interdiction, a petition to revoke the interdiction was filed by an attorney in Alexandria, Louisiana, on behalf of Charlie Fuqua, alleging that Charlie Fuqua had recovered from any mental illness from which he may have suffered and that the interdiction should be revoked. A subsequent petition to revoke the interdiction was filed, alleging that the initial judgment was null and void because Charlie Fuqua is domiciled in the Parish of Rapides and the petition was filed in Avoyelles Parish, contrary to LSA-C.C.P. art. 4541. The proceeding to revoke the judgment of interdiction was heard and the revocation denied by the trial court.
*570 In written reasons for judgment, the trial court stated that no evidence was adduced to show lack of jurisdiction or venue in the original action and that all evidence was to the effect that the interdict was a resident of Avoyelles Parish. As to the allegation that Charlie Fuqua had regained his mental competency, the trial court found that the interdict was 97 years old; that he had a healing broken leg and a pacemaker; that he is partially deaf; senile; slow in his responses; easily influenced in his actions and conduct; needs almost constant care and attention; and is and has been confined in a nursing home. The trial court stated that there was some conflict in the evidence as to whether or not the interdict was capable of managing his business affairs, but the court found the preponderance to be that Charlie Fuqua was not capable of managing his business affairs. The trial court stated that Charlie Fuqua's main complaint is that he would rather be at his home in Avoyelles Parish with his wife rather than in the nursing home in Pineville.
Charles Fuqua has appealed from the judgment of the trial court dismissing his petition to revoke the interdiction. Appellant urges that the trial court erred in granting the original judgment of interdiction and that the interdiction should be removed.
Dr. Walter S. Easterling, qualified as an expert in psychiatric medicine, testified that he had talked to Charlie Fuqua, the staff at the nursing home, and Charlie Fuqua's wife and daughter. Dr. Easterling testified that Charlie Fuqua was alert, cheerful and cooperative and was oriented as to time, place and person. Dr. Easterling testified that Charlie Fuqua had no significant disability other than a hearing loss and some pain in his left leg and that, in his opinion, Charlie Fuqua was not incapable of handling his own affairs and taking care of his person. He testified that Charlie Fuqua would like to return home to Marksville and that, if he were unable to do so, he would rather be in a nursing home closer to Marksville.
Dr. R. Pierce Foster, qualified as an expert in the fields of vascular and general surgery, testified that he had treated Charlie Fuqua following an automobile accident in which Mr. Fuqua had broken his leg and developed heart trouble. Dr. Foster installed a permanent cardiac pacemaker on November 26, 1973. Dr. Foster said that he had seen Charlie Fuqua quite frequently in 1973 in connection with the pacemaker and then in July and August of 1974 in connection with an abscess on his back. The broken leg was treated by Dr. Cayer, an orthopedic surgeon, and Dr. Pardue treated Mr. Fuqua as his medical doctor. Dr. Foster testified that Mr. Fuqua was not extremely deaf and their ability to communicate with each other was reasonably good, surprisingly so for a man of his years. However, the automobile accident, in this doctor's opinion, produced substantial deterioration in Mr. Fuqua's mental processes. Dr. Foster testified that Mr. Fuqua had improved some following the accident and was not totally incompetent, but he did not feel that he was capable of managing his financial affairs because of senility. However, Dr. Foster also testified that Mr. Fuqua would be better off in the environment where he wished to be and that it was not necessary that he be confined to a nursing home.
I. In regard to the question of venue, LSA-C.C.P. art. 4541 provides as follows:
"A petition to have a person interdicted shall be filed in the district court of the parish of his domicile."
LSA-C.C.P. art. 44 provides in pertinent part as follows:
"The venue provided in Articles 2006, 2811, 2812, 3941, 3991, 4031 through 4034, 4541, and 4542 may not be waived."
In this instance, Charlie Fuqua has maintained his domicile in the parish of Avoyelles throughout his life. Prior to *571 going to the nursing home in Rapides Parish, he and his wife lived at Moncla Bridge in Marksville, Louisiana for approximately 13 years. Charlie Fuqua testified that he had been at the nursing home in Rapides Parish for approximately a year. According to the testimony of Mrs. Charlie Fuqua, Charlie Fuqua had resided with her in Avoyelles Parish except for the year preceding the hearing when he had been in the hospital and the nursing home. We believe that Charlie Fuqua's residence in a hospital and nursing home outside of Avoyelles Parish would not suffice to constitute a change of domicile. The inventory in the interdiction proceedings shows that all of Charlie Fuqua's property is located in Avoyelles Parish and Avoyelles Parish remains his permanent domicile. See comments under LSA-C.C.P. art. 10(3).
II. The second question presented is whether or not Charlie Fuqua is incapable of taking care of his person and administering his estate and thus properly under interdiction within the provisions of LSA-C.C. art. 422.
The medical evidence is inconclusive. However, Dr. Easterling, who found Charlie Fuqua competent, only examined him on one occasion as to his mental state and did not make a physical examination. Dr. Foster, who saw Charlie Fuqua numerous times, stated that he was senile and it would be best for him not to manage his own financial affairs. Dr. Foster did not feel the physicial disability was such that nursing home care was required.
The curator, Luther Fuqua, admitted that Charlie Fuqua may have regained some of his mental faculties since the original petition for interdiction, but said that Charlie Fuqua's memory was such that he could not handle his own affairs.
Aswell Gaspard said that he believed Charlie Fuqua had recovered from his automobile accident and was no longer mentally incompetent.
The under-curatrix, Mrs. Lela Fuqua McGraw Stewart, stated that she lived about three miles from the nursing home in Pineville where her father resided and visited him nearly every day. She stated that he was physically unable to care for himself and received good care in the nursing home. She said that his memory was sometimes erratic. During Dr. Easterling's examination he was assisted in communicating with the patient by Charlie Fuqua's wife and daughter, Mrs. Tarver.
Although Charlie Fuqua is apparently in excellent condition for his age, we can not escape the conclusion that he requires some assistance in caring for `himself and in managing his financial affairs. The trial court, which had an opportunity to see Charlie Fuqua firsthand was of this opinion, and we find no manifest error, even though the evidence presents a rather close question. Compare In Re Adams, 209 So. 2d 363 (La.App. 4 Cir. 1968) and Interdiction of Reeves, 187 So.2d 546 (La.App. 3 Cir. 1966), writ refused, 249 La. 716, 190 So.2d 234.
We also emphasize that this is a proceeding to set aside an interdiction. The burden of proof is on the petitioner to show that the interdiction should be terminated. This, he failed to do.
We feel that it is our duty to note that a person under interdiction is a ward of the state and subject to the close supervision of the court of his domicile. In Re Interdiction of Barnes, 182 So.2d 849 (La. App. 1 Cir. 1965). We also note the provisions of LSA-C.C.P. art. 4555 which reads as follows:
"The court may order that an interdict be attended in his own home, in a hospital, or in any other place, within or without the state, taking into consideration the nature of his incapacity and the value of his property. If necessary, the court may order that an interdict be confined in safe custody."
*572 In view of the fact that the medical evidence indicated strongly that Charlie Fuqua would be best cared for in his own home, and that he would be happier at home than in the nursing home, we feel that the trial court should consider (perhaps on its own motion under the authority of LSA-C.C. art. 4555) whether Charlie Fuqua should be transferred from the nursing home in Pineville to his domicile in Marksville, Louisiana.
All costs are assessed against the estate of the interdict, Charlie Fuqua, plaintiff-appellant.
Affirmed.